IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

STATE OF NEW MEXICO,

        Plaintiff,

v.                                     No. CIV 00-851 BB/LFG

JICARILLA APACHE TRIBE,
MESCALERO APACHE TRIBE,
PUEBLO OF ACOMA, PUEBLO
OF ISLETA, PUEBLO OF
LAGUNA, PUEBLO OF
POJOAQUE, PUEBLO OF
SANDIA, PUEBLO OF SAN
FELIPE, PUEBLO OF SAN JUAN,
PUEBLO OF SANTA ANA,
PUEBLO OF TAOS, and PUEBLO
OF TESUQUE,

        Defendants.

MEMORANDUM OPINION AND ORDER
DENYING MOTIONS TO DISMISS FOR LACK OF JURISDICTION

THE State of New Mexico has filed suit seeking injunctive and declaratory

relief against the Jicarilla and Mescalero Apache Tribes, as well as the Pueblos of

Acoma, Isleta, Laguna, Pojoaque, Sandia, San Felipe, San Juan, Santa Ana, Taos

and Tesuque (hereinafter the "Tribes").  Each of the Tribes, with the exception

of the Mescalero Apache,[1] have filed a motion to dismiss for lack of jurisdiction. Having fully considered the briefs and other submissions of all parties, the Court has determined it possesses jurisdiction over both the subject matter and the parties.

<u>*Discussion*</u>

I.      <u>*Factual Background*</u>

The course of negotiations between the State and the Tribes over the gambling issue has been lengthy and litigious. *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546 (10th Cir. 1997) (tracing the history of earlier negotiations and litigation). Unfortunately, a compromise that can withstand legal analysis has proven elusive thus far. The present case brings the 1997 compacts between the State and the Tribes under the judicial microscope.

At the opening of the 1997 legislature, the Tribes faced the closure of their gaming facilities unless the state legislature approved new and legally valid compacts. The legislature's response was to narrowly adopt two state statutes setting out an approved form of a standard compact and a separate revenue-sharing agreement ("RSA"). The form RSA contained in § 11-13-2 NMSA 1978

---

[1]      The Mescalero Tribe has requested the Court compel the State to participate in their previously initiated arbitration.

(1997 Repl. Pamp.), authorizes the state governor to enter into a compact with only those tribes which have executed an RSA in the form set forth in that Section.   The RSA requires the tribe to pay the state 16% of its total "net win"[2] from gaming machines.   In exchange, the state agrees to certain limited restrictions on the expansion of non-Indian gaming.   If the state exceeds these restrictions, the tribe's revenue-sharing obligation terminates.

Each of the Gaming Tribes entered into a compact and RSA in the form approved by the legislature.   These documents were, in turn, submitted to the Secretary of the Interior for his approval under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*   The IGRA authorizes the Secretary to approve or, under certain specified conditions, disapprove any tribal-state compact.   25 U.S.C. § 2710(d)(8).   Rather than exercising this authority,[3] however, the Secretary chose to take no official action and allow the compacts to go into effect by operation of law.   *See* 25 U.S.C. § 2710(d)(8)(C).   The Secretary did, however, issue a notice in the Federal Register stating:

---

[2]     Defined as amounts wagered less prizes paid out, and certain other deductions.

[3]     Exercise of his authority would have also provided an avenue of judicial review not lined with the jurisdictional thickets here presented.  *See* 5 U.S.C. § 701 *et seq.*

3

> **The Department believes that the decision to let the 45-day statutory deadline for approval or disapproval of the Compacts expire without taking action is the most appropriate course of action given the unique history of state and federal court cases and legislative actions that have shaped the course of Indian gaming in New Mexico.  A letter further explaining the Department's decision is available from the Bureau of Indian Affairs ....**

**62 Fed. Reg. 45867, Aug. 29, 1997.**

After attempts to renegotiate their compacts failed, each of the Gaming Tribes, at varying times and in varying degrees, began refusing to comply with the RSA requirement that they pay 16% of their slot machine revenue to the State. The State brought this suit seeking a declaration that:  (1) the RSA requirements are part of the compacts; (2) the RSAs are legal under the IGRA; (3) the Gaming Tribes are violating the IGRA by failing to remit the payment required by the RSAs; and (4) all tribal gaming in violation of the IGRA be enjoined.  In the motions under consideration, the Tribes challenge both the subject matter and personal jurisdiction of this Court.

## II. *Subject Matter Jurisdiction*

Federal courts have limited subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *United States ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999). Therefore, a district court has the duty to determine whether it possesses such jurisdiction before addressing the merits of a claim. Fed. R. Civ. P. 12(h)(3). *Land v. Dollar*, 330 U.S. 731, 739 (1947); *see also Mescalero Apache Tribe v. State of New Mexico*, 131 F.3d 1379, 1386 (10th Cir. 1997) (federal courts have a duty to satisfy themselves they possess jurisdictional authority).

### A. *The Arguments*

The State asserts that subject matter jurisdiction exists as a federal question under the IGRA. *See* 28 U.S.C. § 1331. The jurisdictional provisions of the IGRA state:

> (7)(A)   The United States district courts shall have jurisdiction over —
>
> * * *
>
> (ii)   any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any tribal-State compact entered into under paragraph (3) that is in effect ....

25 U.S.C. § 2710(d)(7)(A).

The Tribes argue that although the present action was initiated by the State and seeks to enjoin Class III gaming, it does not fall within the ambit of the statutory language because:  (1) the RSAs, which are the basis of this action, are not part of any compact "that is in effect"; and (2) it does not seek to enjoin "a Class III gaming activity."

The Tribes' argument is summarized as follows:

> Here, the State has not alleged that the Tribes are conducting gaming in violation of IGRA, nor has it alleged that the Tribes are conducting games that are not permitted under the Compact or *are* conducting their games in a manner that is contrary to provisions of the Compact.  Rather, the State is seeking to enforce the terms of the RSA, a separate document that has nothing to [do] with the Pueblo's conduct of class III gaming, but rather purports to impose a tax on tribal gaming.

Santa Ana, San Felipe, Tesuque Mem. Supp. at 15 (emphasis in original).

**B.**     *The RSA is Part of the Compact and Validity of the Compact is a Federal Question.*

In fact, the State does allege the Tribes "*are* conducting their games in a manner that is contrary to provisions of the Compact."  Specifically, the State alleges, "the Compact is not effective unless and until the revenue-sharing provisions are executed."  Pl.'s Compl. at 14.   Both in their statutory form, and as executed by each of the Tribes, the two agreements specifically refer to each

other.[4]  In particular, Section 9 of the statutory Indian gaming compact only authorizes the State Governor "to execute compacts with an individual Tribe that has also entered into revenue-sharing agreements ...." § 11-13-1 NMSA 1978 (1997 Repl. Pamp.).  The revenue-sharing agreement, in turn, expressly states: "Execution of an Indian gaming compact is conditioned upon execution of a revenue-sharing agreement." § 11-13-2.  The Tribes acknowledge "execution of the RSA was required for a Tribe to obtain a Compact from the State."  Isleta, Sandia Mem. at 2.   There can be little question, then, at least from the State's perspective, that the RSA is considered a *quid pro quo* for the authorization of the semi-exclusive type III gaming authority given the tribes.  *See* Pl.'s Compl. at ¶¶ 14-15.

The Tribes next argue that even if the RSA is actually a part of the compact, it is not "in effect" because the Secretary of the Interior only approved it "to the extent the compact is consistent with the provisions of IGRA."  While the RSA expressly provides that it should not be "interpreted as conferring any tax, fee,

---

[4]        In this regard it is of some significance that the Secretary of the Interior reviewed both the compact and RSA and in a letter to State Governor Johnson stated "the Department received the two interrelated documents (the Gaming Compact and the Revenue-Sharing Agreement) <u>which together comprise the tribal-State compact</u>." Letter of 8-23-97 (emphasis added).

charge or other assessment upon an Indian Tribe," the Tribes argue that since the

State unilaterally imposed the RSA, it is in effect a tax and therefore invalid.

The Tribes' argument, however, overstates the question.  The issue is not

so clear that the Secretary of the Interior, who is expressly authorized by Congress

to review all compacts before they take effect, was willing to say the RSA

requirement clearly violated the IGRA.  *See* 25 U.S.C. § 2710(d)(8).  The

Secretary is expressly authorized to disapprove a compact if it violates any of the

provisions of the IGRA or "any other Federal law that does not relate to

jurisdiction."  25 U.S.C. § 2710(d)(8)(B).  Rather than disapprove any of the

compacts at issue, however, the Secretary merely allowed the compacts to go into

effect by his inaction.  *See* 25 U.S.C. § 2710(d)(8)(C).  Thereafter, he sent a letter

to each of the tribal authorities stating:

> To date, the Department has approved payments to a
> State only when the State has agreed to provide
> substantial exclusivity, *i.e.*, to completely prohibit non-
> Indian gaming from competing with Indian gaming, or
> when all payments cease while the State permits
> competition to take place.  The Department has sharply
> limited the circumstances under which Indian tribes can
> make direct payments to a State.  Otherwise, States
> effectively would be able to leverage very large payments
> from the Tribes, in derogation of Congress' intent in 25
> U.S.C. § 2710(d)(4) of IGRA not to permit States "to
> impose any tax, fee, charge, or other assessment upon an

Indian tribe ... to engage in Class III gaming activities." In addition, because of the Department's trust responsibility, we seek to ensure that the cost to the Pueblo – in this case up to 16% of "net win" – is appropriate in light of the benefit conferred on the Pueblo.

In light of the large payments required under the Compact, the Department questions whether the limited exclusivity provided the Pueblo meets the standards discussed in the previous paragraph. The Compact does not provide substantial exclusivity. Indeed, the Compact seems to expand non-Indian gaming by allowing for a state lottery, the operation of a large number of electronic gaming devices by fraternal, veterans, or other nonprofit membership organizations, gaming by nonprofit tax exempt organizations for fund-raising purposes, and the operation of electronic gaming devices at horse tracks every day that live or simulcast horse racing occurs.

Furthermore, Section 11(d)(3)(A) of IGRA, 25 U.S.C. § 2710(d)(3)(A), calls for Indian tribes and States to conduct give-and-take negotiations regarding the potential terms of a tribal-state compact. Our concern is highlighted by our understanding that neither the Compact nor the Revenue-Sharing Agreement were the result of a true bi-lateral tribal-state negotiation process.

Ex. F (letter to Governor Viarrial), Pojoaque Mem. Supp. at 2.

The validity of the RSA provisions is, then, a complex legal issue which may indeed become a focus in the litigation. However, the Court is not prepared to

decide the merits of the case at the jurisdictional phase. *Bell v. Hood*, 327 U.S. 678, 681-83 (1946); *Davoll v. Webb*, 194 F.3d 1116, 1129 (10th Cir. 1999) (When jurisdiction is entwined with the merits, the general rule is that the federal court possesses jurisdiction and should decide the merits.). What is clear at this juncture is that the interpretation of the IGRA is a federal question and federal district courts "indisputably have the power to determine whether a Tribal-State compact is valid." *Pueblo of Santa Ana v. Kelly,* 104 F.3d at 1557.

C.      *The State Seeks to Enjoin "a Class III gaming activity"*

The Tribes also argue the IGRA does not authorize the State's present suit because it does not seek to enjoin "a Class III gaming activity." The Tribes argue use of the "a" limits the Court's injunctive authority to suits seeking to restrict one specific gaming activity. The Court must reject this crabbed statutory interpretation. *See, e.g. United States v. Freisinger*, 937 F.2d 383, 390 (8th Cir. 1991) (statute proscribing carrying "a" firearm authorized prosecution for each and every firearm). Even if the Congress did intend "a" to be such a limiting modifier, however, the RSA requires a tribe to "only share that part of its revenue arising from the use of Gaming Machines and all other gaming revenue is

10

exclusively the Tribe's."  Ex. B, § 2.E, Pojoaque Mem. Supp.[5]  **Gaming machines are obviously "a gaming activity" under the IGRA.**  *Citizen Band of Potawatomi Indian Tribe of Okla. v. Green*, **995 F.2d 179 (10th Cir. 1993);** *Crow Tribe of Indians v. Racicot*, **87 F.3d 1039 (9th Cir. 1996).  Therefore, to the extent the Tribal argument that the RSAs are the foundation of the State's claim has validity, gaming machines, which are the subject of the RSAs, are "a Class III gaming activity."**

      **D.**      *The Court has Subject Matter Jurisdiction*

      **The Tribes conclude that since the RSA is not a part of a valid compact and the State is not seeking to enjoin "a gaming activity," the IGRA does not provide federal question jurisdiction under 28 U.S.C. § 1331.  As the above discussion makes clear, the Court rejects the Tribes' underlying premises and therefore the resultant conclusion.**  *See Division 1287, Amalgamated Transit Union v. Kansas City Area Transp. Auth.*, **582 F.2d 444, 449 (8th Cir. 1978),** *cert. denied,* **439 U.S. 1090 (1979) (jurisdictional question not dependent upon merits).  Case law makes it clear that the IGRA recognizes the existence of federal question jurisdiction when the issue before the Court is the scope and validity of a tribal-**

---

    [5]     Ironically, gaming machines are also the very activity over which the Tribes are not given the exclusivity which was the focus of the Secretary's concern.

state gaming compact. *Pueblo of Santa Ana v. Kelly*, 104 F.3d at 1557; *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1055-56 (9th Cir. 1997).

III.   *Personal Jurisdiction – Sovereign Immunity*

   "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Manufacturing Tech., Inc.*, 523 U.S. 751, 754 (1998).   While jurisdiction over the tribes is separate from subject matter jurisdiction, *see Blatchford v. Native Village of Noatak*, 501 U.S. 775, 786 n. 4 (1991), in this case both are controlled by the IGRA.   As noted earlier, Congress expressly provided that a state could initiate an action in federal district court to enjoin a Class III gaming activity located on Indian lands in violation of any tribal-state compact. While the issue has only arisen in a limited number of jurisdictions, the courts which have confronted the question have consistently held that the IGRA thus waives tribal sovereign immunity when the jurisdiction of a federal district court is invoked to consider the scope or effect of tribal gaming under the IGRA. *See Mescalero Apache Tribe*, 131 F.3d at 1385-86; *New York v. Oneida Indian Nation*, 78 F. Supp. 2d 49, 54 (N.D.N.Y. 1999); *Montgomery v. Flandreau Santee Sioux Tribe*, 905 F. Supp. 740, 745 (D.S.D. 1995); *Maxam v. Lower Sioux Indian*

*Community of Minn.*, 829 F. Supp. 277, 281 (D. Minn. 1993).  Another judge of this Court has also recognized the IGRA provides a waiver of tribal immunity to consider the validity or scope of a state-tribal gaming compact.  *Apache Tribe of the Mescalero Reservation v. New Mexico*, No. CIV 92-0076 JC/WWD (June 6, 1996).

The Tribes argue that even if Congress did, in fact, waive their sovereign immunity in the IGRA, it also waived the sovereign immunity of the states.  They then point out that the United States Supreme Court held this congressional waiver of state immunity violative of the Eleventh Amendment.  U.S. CONST. amend. XI; *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996).  They reason that since the overall congressional intent has been thwarted, fairness now dictates tribal immunity be restored to balance the State's Eleventh Amendment immunity.  Jicarilla, Laguna, San Juan, and Taos Mem. at 24-27.  There is no question that Congress intended the tribes and states be placed on equal footing as sovereigns under the IGRA.  S. Rep. No. 100-446, at 6, 13, 1998 U.S.C.C.A.N. at 3076, 3083, 134 Cong. Rec. 24023, 25378 (1988).  However, the fact that the Supreme Court relied on the Eleventh Amendment to find Congress overstepped its constitutional authority with regard to a waiver of state sovereign immunity, has no legal significance for the tribes.

Initially, it must be noted if Congress considers the *Seminole Tribe* decision unfair, it has had almost five years to redress the balance. Second, even if *Seminole Tribe* generally created an imbalance unforeseen by Congress, it is irrelevant in the present context. The State has waived its sovereign immunity in the present case insofar as it has brought the validity of the compacts, including the RSAs, before this Court.

The IGRA, then, provides a solid foundation for both federal question jurisdiction and a waiver of tribal immunity. Since the State has filed the case, the Court has jurisdiction over the subject matter and the parties.


## O R D E R

For the above stated reasons, this Court finds it has both subject matter jurisdiction over the dispute and personal jurisdiction over the Defendants, and Defendants' motions to dismiss are therefore DENIED.

14

**Dated at Albuquerque this 6th day of December, 2000.**



BRUCE D. BLACK
**United States District Judge**


**Counsel for Plaintiff:**
> Patricia A. Madrid, Attorney General, Stuart M. Bluestone, Deputy Attorney General, Elizabeth A. Glenn, Assistant Attorney General, Santa Fe, NM
> Christopher D. Coppin, Special Counsel, Albuquerque, NM

**Counsel for Defendants:**
> Wayne H. Bladh, Santa Fe, NM, for Jicarilla Apache Tribe
> Gregory M. Quinlan, Alamogordo, NM, for Mescalero Apache Tribe
> Peter C. Chestnut, Ann Berkley Rodgers, Albuquerque, NM, for Pueblo of Acoma
> David, C. Mielke, Albuquerque, NM, and Reid Peyton Chambers, Douglas B.L. Endreson, Washington, DC, for Pueblos of Isleta and Sandia
> B. Reid Haltom, Albuquerque, NM, for Pueblo of Laguna
> Frank Demolli, Santa Fe, NM, and Michael L. Roy, Washington, DC, for Pueblo of Pojoaque
> Gwenellen Janov, Albuquerque, NM, for Pueblo of San Felipe
> Lee Bergen, Albuquerque, NM, for Pueblo of San Juan
> Richard W. Hughes, Santa Fe, NM, for Pueblo of Santa Ana
> Lester K. Taylor, Albuquerque, NM, for Pueblo of Taos
> Catherine Baker Stetson, Albuquerque, NM, for Pueblo of Tesuque